UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| DEBUSSY LLC, on behalf of itself and all others similarly situated, | : 05 Civ. 5550 (SHS) (JCF) |
|  | : |
|  | : (ECF CASE) |
| Plaintiff, | : |
|  | : |
| against | : |
|  | : |
| DEUTSCHE BANK AG and DEUTSCHE ASSET MANAGEMENT, | : |
|  | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW IN OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

ABBEY GARDY, LLP
Arthur N. Abbey (AA-8079)
Karin E. Fisch (KF-1082)
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

    The Parties .................................................................................................. 4

    The Trust ..................................................................................................... 4

    Deutsche Bank Acquires Scudder And Assumes The Role of Portfolio
    Manager Of The Trust ................................................................................ 6

    Defendants Cause The Trust To Be Dissolved ............................................ 7

    Plaintiff Files Suit ...................................................................................... 8

ARGUMENT ....................................................................................................... 9

    A.    Plaintiff Has Standing To Assert The Claims ...................................... 10

    B.    Plaintiff Has Stated A Claim For Breach Of Fiduciary Duty ............... 15

    C.    Plaintiff Has Stated A Claim for Breach of Contract .......................... 17

    D.    Plaintiff's Claims Are Not Duplicative ............................................... 20

    E.    Deutsche Bank Is A Proper Party ....................................................... 20

CONCLUSION .................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                               **Page**

Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,
 No. 03 Civ. 1537 (MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003),
 aff'd, 110 Fed. Appx. 191 (2d Cir. 2004) .......................................................................... 18

Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc.,
 283 A.D.2d 448 (N.Y. App. Div. 2d Dep't 2001) ............................................................ 20

Bestolife Corp. v. Am. Amicable Life,
 5 A.D.3d 211 (N.Y. App. Div. 1st Dep't 2004)................................................................. 16

Borden, Inc. v. Spoor Behrins Campbell & Young,
 735 F. Supp. 587 (S.D.N.Y. 1990) ................................................................................... 10

Central Bank of Denver, N.A. v. Deloitte & Touche,
 928 P.2d 754 (Colo. Ct. App. 1996) ................................................................................. 11

Conley v. Gibson,
 355 U.S. 41 (1957).............................................................................................................. 10

Cont'l Bank, N.A. v. Caton,
 Civ. A. No. 88-1611-C, 1990 U.S. Dist. LEXIS 11624 (D. Kan. Aug. 6, 1990) ............ 11

Cosmas v. Hassett,
 886 F.2d 8 (2d Cir. 1989)................................................................................................... 10

Davis v. Dime Sav. Bank,
 158 A.D.2d 50 (3d Dept. 1990) ......................................................................................... 20

Feldbaum v. McCrory Corp.,
 Civ. A. Nos. 11866, 11920, 11206, 1992 Del. Ch. LEXIS 113 (Del. Ch. June 2, 1992) . 12

Ferber v. Travelers Corp.,
 785 F. Supp. 1101 (D. Conn. 1992).................................................................................... 21

Foman v. Davis,
 371 U.S. 178 (1962)............................................................................................................ 21

Furia v. Furia,
 116 A.D.2d 694 (N.Y. App. Div. 2d Dep't 1986) ............................................................ 18

Goldman v. Belden,
 754 F.2d 1059 (2d Cir. 1985)............................................................................................. 10

Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.,
    45 N.Y.2d 692 (1978) ............................................................................................ 15

Lange v. Citibank, N.A.,
    C.A. No. 19245-NC, 2002 Del. Ch. LEXIS 101,  (Del. Ch. Aug. 13, 2002) ................... 12

Luce v. Edelstein,
    802 F.2d 49 (2d Cir. 1986)..................................................................................... 21

Meckel v. Cont'l Resources Co.,
    758 F.2d 811 (2d Cir. 1985).................................................................................... 11

Raglan Realty Corp. v. Tudor Hotel Corp.,
    149 A.D.2d 373 (N.Y. App. Div.1st Dep't. 1989)........................................................ 20

Rossdeutscher v. Viacom, Inc.,
    768 A.2d 8 (Del. 2001) .................................................................................... 13, 14

Tooley v. Donaldson, Lufkin & Jenrette, Inc.,
    845 A.2d 1031 (Del. 2004) ..................................................................................... 14

U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.,
    864 A.2d 930 (Del. Ch. 2004).................................................................................. 11

Wiener v. Lazard Freres & Co.,
    241 A.D.2d 114 (N.Y. App. Div. 1st Dep't 1998)........................................................ 15

Yoder v. Orthomolecular Nutrition Inst., Inc.,
    751 F.2d 555 (2d Cir. 1985).................................................................................... 10

Zimmer-Masiello, Inc. v. Zimmer, Inc.,
    159 A.D.2d 363 (N.Y. App. Div. 1st Dep't 1990)....................................................... 20

## **Rules**

New York Civil Practice Law and Rules

    § 3014.................................................................................................................. 20

Federal Rules of Civil Practice:

    Rule 12(b)(6)........................................................................................................... 9

    Rule 15(a)............................................................................................................. 21

Plaintiff Debussy LLC ("Debussy") submits this memorandum in opposition to defendants' motion to dismiss the Class Action Complaint ("Complaint"). For the reasons set forth herein, defendants' motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Riverside Loan Trust II ("Riverside II" or the "Trust") was a Delaware business trust formed for the purpose of issuing two types of securities – notes and certificates. Plaintiff was the owner of all of the certificates issued by Riverside II and two mutual funds owned all of the notes. As expressly permitted by the trust agreement through which the Trust was formed, the duty to manage the loan portfolio in which the Trust invested was delegated to a Portfolio Manager. Prior to March 2002, the Portfolio Manager of the trust was Scudder Kemper Investments ("Scudder"), the owner of the mutual funds that had purchased the notes.

In March 2002, Deutsche Bank AG solicited plaintiff to consent to the substitution of its asset management subsidiary as Portfolio Manager of the Trust. The solicitation was made in the context of Deutsche Bank AG's acquisition of Scudder. As soon as Deutsche Bank AG received plaintiff's approval of the substitution, it collapsed the entire investment. Within months of taking over the management of the Trust, Deutsche Asset Management failed miserably to manage, dissolved the Trust and liquidated the underlying loan portfolio at the purported direction of the two mutual funds that Deutsche Bank AG then owned. Deutsche Asset Management did not manage the Trust so as to maximize the return to investors, but rather impermissibly changed the investment objective of the Trust from value maximization to total liquidation.

The duty of a portfolio manager is to manage for the benefit of investors. Under the Trust's governing agreements, the Portfolio Manager was not entitled to alter the investment

objective of the Trust in any way and was bound to act prudently in managing the assets of the Trust. Defendants shirked their obligations, abandoning the investment objective of the Trust **admittedly** because "this was an investment strategy that it [Deutsche Asset Management] no longer wished to pursue . . . ." ¶29.[1]  Defendants were not permitted by contract or by law to abandon the Trust simply because Deutsche Bank AG wanted to invest in some other strategy. The duties and obligations of Deutsche Asset Management as the Portfolio Manager ran to the Trust and its beneficiaries, not to its parent company.  At the time that it solicited plaintiff's consent to the appointment of its asset management arm as Portfolio Manager, Deutsche Bank AG did not disclose to plaintiff that its objective was to liquidate the Trust months later in light of its desire not pursue the investment strategy any longer, rather than to manage the Trust for the benefit of investors.  Had plaintiff known this crucial information, it never would have consented to the substitution.

Defendants acknowledge that they abandoned the Trust because of their own change of heart with respect to this particular investment strategy.  ¶29.  Plaintiff also has alleged that defendants dismantled the Trust prematurely in order to serve the interests of Deutsche Bank AG, the parent company of Deutsche Asset Management.  Plaintiff believes that defendants caused the two mutual funds to take the actions detailed in the Complaint in order to serve Deutsche Bank AG's own interests as a competitor of the Trust in the market for secured bank debt.  Plaintiff's claim is not, as defendants suggest, that Deutsche Asset Management received notices of redemption from an independent source and simply carried out its orders at a bad time

---

[1]   Paragraph references are references to plaintiff's Class Action Complaint appended to the Affidavit of Andrew W. Stern as Exhibit A (hereinafter, "Stern Ex. __").  The full text of the letter is appended as Exhibit A to the Affidavit of Karin E. Fisch ("Fisch Aff.") submitted herewith.

or in an imprudent manner. Plaintiff's claim is that the redemption request came from an entities controlled by Deutsche Bank AG and was calculated to serve Deutsche Bank AG's own interests. Specifically, plaintiff alleges that defendants took the action complained of in order to eliminate its own conflicts as a competitor for the bank debt underlying the Trust and to create a corporate opportunity for itself, in violation of both contractual and fiduciary duties owed to the Trust and its direct and indirect investors.

Defendants' defense to plaintiff's claims is that, even assuming that the alleged facts are true as the Court must on a motion to dismiss, plaintiffs have no cause of action because (1) plaintiff has not established the existence of a fiduciary relationship between itself and Deutsche Asset Management as the Portfolio Manager of the Trust; (2) plaintiff is not a party to the Portfolio Management Agreement entered into by Deutsche Asset Management and the Trust, and (3) any claim asserted by plaintiff is a claim that must be asserted by the now defunct Trust. Thus, according to defendants, even if Deutsche Bank AG improperly garnered plaintiff's consent to its subsidiary's acting as Portfolio Manager of the Trust, impermissibly caused mutual funds that it owned to issue notices of redemption causing the termination of the Trust at the expense of the holders of the securities and profited from the premature redemption, plaintiff is without recourse.

Defendants' arguments are premised on misstatements of the law and the facts. Defendants cite to Delaware case law regarding shareholder derivative actions when the rights of plaintiff vis-à-vis the Trust are governed by Trust documents. Defendants confuse the law of trusts asserting that plaintiff is at the mercy of a trustee, rather than recognizing that a traditional trustee acts at the behest of those it serves. Defendants distort plaintiff's claim factually by asserting the plaintiff takes issue only with the way in which the loan portfolio was dismantled.

Defendants would have the Court believe that Deutsche Asset Management was simply following orders by dismantling the Trust at the request of the noteholders, when in fact the holders of the notes were two mutual funds owned by and beholden to Deutsche Bank AG. The crux of plaintiff's case is that Deutsche Asset Management **induced** plaintiff to consent to its substitution as Portfolio Manager and then **caused** the two funds to issue the redemption request in order to provide an exit strategy from an investment that it deemed undesirable and to serve the interests of its parent company that was a competitor for the underlying loans held by the Trust. These conflicts infected defendants' conduct with respect to the transaction at issue and lies at the heart of this case.

## STATEMENT OF FACTS

### The Parties

Plaintiff Debussy is a New York limited-liability corporation created solely for the purpose of investing in the leveraged bank loan Trust discussed herein. ¶10. Deutsche Asset Management is the marketing name in the United States for the asset management activities of Deutsche Bank AG and other Deutsche Bank entities (collectively, "Deutsche Bank"). Deutsche Asset Management is one of the world's largest investment management companies with over $730 billion in assets under management. ¶12.[2]

### The Trust

Riverside II was a business trust established in 1998 under the laws of the State of Delaware. The Trust was established (1) to issue certain floating rate Certificates and Notes

---

[2]   Defendants point out in their first footnote that the proper defendant is Deutsche Investment Management Americas Inc. ("DIMA"). While plaintiff has no reason to question defendants' assertion, plaintiff will continue to refer to the defendant as Deutsche Asset Management as that term is used in the Complaint. Plaintiff will amend the Complaint accordingly when it is satisfied that DIMA is the appropriate entity to be named as the defendant.

(collectively, the "Securities"); (2) to invest and reinvest the proceeds from sale of the Securities in certain eligible investments; (3) to enter into agreements as necessary in connection with the Trust Agreement and the Indenture, such as a Portfolio Management Agreement and the Swap Agreement and (4) to engage in other activities "necessary, suitable or convenient" to accomplish any of the above. ¶13

The Securities were issued on or about July 27, 1998. The Certificates were issued pursuant to a Trust Agreement dated as of July 16, 1998 between Debussy and Chase Manhattan Bank Delaware ("Chase Delaware"), as Trustee. The Notes were issued pursuant to an Indenture also dated as of July 16, 1998 between the Trust, as Issuer, and The Chase Manhattan Bank ("Chase Bank"), as Indenture Trustee. The Trust documents provided for a 10-year term, beginning on July 16, 1998 and expiring on July 16, 2008. Debussy purchased 100% of the Trust Certificates. Two Scudder Mutual Funds (Scudder Diversified Income Fund and Scudder Multi-Market Income Fund) purchased 100% of the Notes issued by the Trust. ¶¶14-15.

Investors in the Securities recognized a return on their investment by agreeing to exchange payments linked to the market value of and payments received under certain senior secured bank loans ("Reference Loans") designated for inclusion in a portfolio of loans (the "Reference Loan Portfolio") pursuant to a Swap Agreement between the Trust and Chase Bank as Swap Counterparty. The Trust had no direct interest in any Reference Loan, but rather had an economic interest effected solely through calculations set forth in the Swap Agreement. By purchasing the Securities, investors essentially were purchasing a derivative interest in the Reference Loans. The intended economic effect of the of the Swap Agreement was to allow holders of Securities of the Trust to participate indirectly on a leveraged basis in the total return from loans in the Reference Loan Portfolio, including interest, fees and realized market value

changes. The Trust provided quarterly distributions to the Certificateholders at a negotiated per annum rate and interest to the Noteholders at a negotiated per annum rate, each less fees and expenses necessary to the transaction. ¶¶16-17.

**Deutsche Bank Acquires Scudder And**
**Assumes The Role Of Portfolio Manager Of The Trust**

On July 16, 1998, Scudder became the Portfolio Manager of the Trust, thereby assuming complete responsibility for the management of the Riverside II Reference Loan Portfolio upon which all of the returns to the Trust depended. The role of Scudder as Portfolio Manager was governed by a Portfolio Management Agreement dated as of July 16, 1998 between Scudder and the Trust. The Portfolio Manager was charged with directing various aspects of the management of the Reference Loan Portfolio, included the designation of loans to be added to the Reference Loan Portfolio. By entering into the Portfolio Management Agreement, the Portfolio Manager expressly agreed to be held to a prudent man standard in performing its services to the Trust. Plaintiff specifically relied on Scudder's willingness to act as Portfolio Manager in deciding to purchase the Certificates. ¶18.

On April 8, 2002, Deutsche Bank announced the closing of its acquisition of Scudder from Zurich Financial Services, its then current owner. Scudder then became the United States mutual fund operation of Deutsche Asset Management which in turn remained a part of Deutsche Bank AG. Deutsche Asset Management assumed Scudder's management responsibilities with respect to the Riverside II Reference Loan Portfolio. ¶19.

Approximately two weeks earlier, on March 25, 2002, Zurich Scudder Investments had written to Debussy as the Certificateholder seeking its consent to allow Deutsche Asset Management to continue to provide investment management services to the Trust after the acquisition. In seeking Debussy's consent, Scudder and Deutsche Asset Management made no

disclosure of the potential conflict between Deutsche Bank as a competitor in the market for the secured bank debt underlying the Trust and Deutsche Bank as the Portfolio Manager of the Trust. Further, at no point during this period did Deutsche Bank indicate that it no longer wished its now-owned Scudder funds to continue to pursue this particular investment strategy or that it was considering redeeming the Notes. Deutsche Bank did not communicate even the possibility that that it would cause the Trust to be collapsed when it took over as Portfolio Manager. ¶¶20-21.

Shortly after completion of the merger, Deutsche Bank and/or Deutsche Asset Management discharged all of the Scudder employees responsible for management of the Loan Portfolio and directly assumed all of Scudder's obligations and duties to the Trust's participants. ¶22.

**Defendants Cause The Trust To Be Dissolved**

On July 22, 2002, less than 4 months after seeking Debussy's consent to its management of the Trust, Deutsche Bank or Deutsche Asset Management caused the two Noteholders, mutual funds managed by Scudder (which was now owned by Deutsche Bank), to execute notices of redemption for the full amount of Notes held on the next succeeding payment date, October 30, 2002, pursuant to the terms of the Indenture and the Trust Agreement. The redemption operated as a forced dissolution of the Trust and a liquidation of the Reference Loan Portfolio collateral. Debussy was powerless to stop the dissolution. ¶23.

At the time it was notified of the redemption, Debussy had no knowledge or estimate of the ultimate distribution to which it would be entitled because the underlying assets would not be valued until the end of 2002. Debussy was asked to consent to various amendments to the Trust documents in order to effectuate the liquidation. The amendments were procedural in nature and included modifications of the final payment date and the asset valuation date. At the time its

consent to the amendments was sought and received, Debussy could not have known the amount of the return on its investment given that the Reference Loans would be sold into a distressed market, nor was there made available any estimated redemption calculation. ¶24.

As calculated on the final payment date of December 13, 2002, the Kemper Diversified Income Fund received only $14,895,505.56 of its initial investment of $30 million, after payment of Trustee fees, other fees and accumulated swap payments to Chase Bank. The Kemper Multi Market Income Fund received $4,985,168,52 of its initial investment of $10 million, after payment of Trustee and other fees and accumulated swap payments to Chase Bank. ¶25. Thus, while the Noteholders received a small portion of their initial investments upon dissolution, Debussy received *nothing*. The cash available for redemption as of December 13, 2002 was insufficient to even cover the outstanding fees and swap payments attributable to the Certificateholders. Deutsche Bank's timing of the dissolution compounded this loss of capital. The Reference Loan Portfolio was sold at a market low exacerbating the losses to the holders of the Securities. Further, the holders of the Securities were deprived of over six years of swap payments that they would have received had Deutsche Bank not caused the Noteholders to issue premature notices of redemption. ¶¶25-26.

## Plaintiff Files Suit

On April 30, 2004, after a series of discussions with representatives of Chase Bank, plaintiff Debussy sent a letter to Chase Delaware as Trustee demanding that Chase Delaware immediately commence an action on behalf of the Riverside II to recover the damages resulting from Deutsche Bank's conduct. ¶27; Stern Ex. G. On November 3, 2004, Chase Delaware (through its successor) sent a letter to Deutsche Asset Management requesting that, as Portfolio Manager, it forward any response to the April 30, 2004 letter. Two weeks later, Deutsche Asset

Management responded to Chase Delaware's letter acknowledging that it had decided to abandon the Trust because "this was an investment strategy that it no longer wished to pursue . . .." As a result of Deutsche Asset Management's letter, Chase Delaware, as Trustee, informed Debussy that it would take no further action unless the Noteholders and Certificateholders furnished directions and satisfactory security or indemnity.  Obviously, seeking direction or security from the Noteholders, two funds controlled by Deutsche Bank, will be futile.  Chase Delaware also referred Debussy to Section 7.16 of the Trust Agreement which provides that the Trustee shall not take or refrain from taking any action at the direction of the Certificateholders if such action or inaction would have an adverse effect in any respects upon the interests of the Portfolio Manager without the consent of the Portfolio Manager.  In other words, Chase Delaware declined to initiate a suit against Deutsche Bank because Deutsche Bank would not agree to sue itself.  ¶¶28-29.

Plaintiff therefore filed this action on April 14, 2005 in the Supreme Court of the State of New York, County of New York.  On June 13, 2005, defendants filed a Joint Notice of Removal in this Court premised upon the German citizenship of Deutsche Bank AG and the presumed citizenship of any class member outside of New York.  Plaintiffs moved to remand but withdrew said motion in light of defendants' showing in their opposition brief that federal jurisdiction was appropriate.  The Rule 26 conference scheduled for September 9, 2005 was adjourned pending the outcome of this motion to dismiss.  Plaintiff seeks prompt denial of defendants' motion so that discovery may commence.

## **ARGUMENT**

The Second Circuit has stated that on motions to dismiss under Rule 12(b)(6), a complaint must be read with "great generosity," all factual allegations are to be presumed true,

and all inferences must be drawn in favor of the complaint.  Yoder v. Orthomolecular Nutrition

Inst., Inc., 751 F.2d 555, 558 (2d Cir. 1985).  See also Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir.

1989).  A motion to dismiss must be denied "unless it appears beyond doubt that plaintiff can

prove no set of facts in support of his claim which would entitle him to relief."  Conley v.

Gibson, 355 U.S. 41, 45-46, (1957)(emphasis added); Goldman v. Belden, 754 F.2d 1059, 1065

(2d Cir. 1985); Borden, Inc. v. Spoor Behrins Campbell & Young, 735 F. Supp. 587, 588

(S.D.N.Y. 1990).

### A.    Plaintiff Has Standing To Assert The Claims

The bulk of defendants' arguments hinge on the assertion that the duties of defendants,

both contractual and fiduciary, run to the Trust and not to plaintiff.  Because plaintiff has no

standing to sue on behalf of the Trust, defendants posit, it has no remedy even if plaintiff's

allegations are all true.  Defendants are wrong.  Plaintiff was the sole investor in the Certificates

issued by the Trust, was a party to the Trust Agreement through which the Certificates were

issued and is not precluded by the terms of the Trust Agreement from bringing this action.

Plaintiff has directed the Trustee to pursue the claims asserted but the Trustee is hamstrung by

the Trust Agreement that prevents the Trustee from **itself** bringing any action that would be

adverse to the interests of the Portfolio Manager.  The Trust Agreement does not address the

unique situation presented by this case where the Portfolio Manager is the alleged wrongdoer

**and** controls the Noteholders, likely because at the time the Trust Agreement was drafted, the

interests of Scudder as the Portfolio Manager were completely aligned with the interests of the

Trust.  Under the circumstances, plaintiff may be found to have standing to pursue this case and

defendants' motion to dismiss at the pleading stage must fail.

The Trust is not a Delaware corporation and is not governed by Delaware law regarding stockholder derivative litigation as defendants assert. Riverside II is not a public corporation and plaintiff is not a public shareholder. Riverside II is a Trust governed by a Trust Agreement and an Indenture. A trustee derives its powers and rights from the documents through which it is established and those rights are specifically limited to those given to it through the terms of its contracts, here the Trust Agreement and Indenture. See U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C., 864 A.2d 930, 939-40 (Del. Ch. 2004)(citing Cont'l Bank, N.A. v. Caton, Civ. A. No. 88-1611-C, 1990 U.S. Dist. LEXIS 11624 at *12 (D. Kan. Aug. 6, 1990)("Whether the Trustee had the authority to bring the claims in this suit on behalf of the bondholders must be decided from the terms of the Trust Indenture. The rights and powers of the Trustee are a function of the Trust Indenture and cannot be generally expanded in contradiction of the Indenture by reference to broad common law principles."); Central Bank of Denver, N.A. v. Deloitte & Touche, 928 P.2d 754, 755 (Colo. Ct. App. 1996)("Whether an indenture Trustee is authorized to sue is determined by the terms of the indenture of trust.")).[3] Defendants' exposition of Delaware law on the subject of derivative litigation is irrelevant with respect to the right of plaintiff to sue on behalf of the Trust. It is the Trust documents that control.

Trust agreements often contain no-action clauses that may prevent an exercise of poor judgment by, for example, a single bondholder who might bring a suit that most bondholders

---

[3]      Defendants' argument turns the law of trusts on its head in suggesting that plaintiff derives its authority with respect to its own investment from the Trustee as opposed to the Trustee deriving its authority from plaintiff and from the Trust documents. This is especially true where, as here, the plaintiff is party to a trust agreement which imposes historic common law duties upon the Trustee beyond those  expressly set out in the Trust Agreement. See Meckel v. Cont'l Resources Co., 758 F.2d 811, 816 (2d Cir. 1985).

would not consider to be in their own self-interest or may protect against the risk of strike suits.[4]

See Feldbaum v. McCrory Corp., Civ. A. Nos. 11866, 11920, 11206, 1992 Del. Ch. LEXIS 113

at *19-27 (Del. Ch. June 2, 1992). The Trust Agreement that governs the relationship between

plaintiff and the Riverside II Trustee contained no such clause, presumably because plaintiff

owned 100% of the Certificates issued by the Trust. Thus concerns about poor judgment of a

small stakeholder and strike suits were not present at the time the agreement was drafted and

executed. Plaintiff here was the only entity with a financial interest in the Certificates issued

pursuant to the Trust Agreement and the powers of the Trustee are dictated solely by the

governing contract and by plaintiff to whom the Trustee owes a fiduciary duty. Indeed, the Trust

Agreement specifically provides that "[t]he Trustee undertakes to perform only such duties as are

specifically set forth in this Agreement, and no implied covenants and obligations shall be read

into this Agreement against the Trustee." Fisch Ex. B at Section 7.1 (c). The Trust Agreement

also states that the Certificateholders, plaintiff here, "may direct the Trustee to take or refrain

from taking any action. . . . ." Fisch Ex. B at Section 7.16. The Section continues providing the

caveat that the Trustee shall not take any action at the direction of the Certificateholders if such

action would have an adverse effect upon the Noteholders (without consent of 50% of the

Noteholders) or the Portfolio Manager. Id. The agreement does not address the ability of

plaintiff to take any action that the Trustee is precluded from itself taking.

Here, plaintiff directed the Trustee to pursue the claims asserted herein. The Trustee

responded by referring plaintiff to Section 7.16 of the Trust Agreement. However, in this case,

---

[4]      A typical no action clause expressly limits a security holder from bringing suit (usually to
remedy a default) absent written notice, consent of a percentage of the security holders,
indemnity to the Trustee and a waiting period. Once the security holder complies with the
requirements of the clause, it is permitted to take the requested action. See, e.g., Lange v.
Citibank, N.A., C.A. No. 19245-NC, 2002 Del. Ch. LEXIS 101, at *2-3, 16-19 (Del. Ch. Aug.
13, 2002)

any action by the Trustee to pursue the claims currently asserted by plaintiff would necessarily

have an adverse effect on the Portfolio Manager as the Portfolio Manager is the defendant.

Likewise, clearly plaintiff cannot seek the consent of 50% of the Noteholders because the

Noteholders are two mutual funds owned and controlled by defendants. Plaintiff has done

everything required under the terms of the Trust. Under the circumstances, any further

"demand" or any further action would be futile and plaintiff is within its right to pursue the

claims.[5]

Further, the Delaware Supreme Court has held that no-action clauses cannot operate to

preclude a party of standing to sue where, as here, the underlying securities have been redeemed.

In a case strikingly similar to this case, the Delaware Supreme Court assessed the ability of a

holder of a contractually created derivative security (CVRs) to sue on behalf of all holders of that

security and a related security (VCRs). Rossdeutscher v. Viacom, Inc., 768 A.2d 8 (Del. 2001).

In that case, the defendant moved to dismiss the complaint arguing that the investor plaintiff had

no standing to sue on behalf of the trust without complying with the terms of the governing trust

agreement. Id. at 21-22. The Delaware Supreme Court rejected that argument because the

securities had been redeemed, as they have here. The Court considered the primary purpose of

no-action clauses, i.e., to avoid the expense of frivolous lawsuits and to protect other securities

holders from the poor judgment of a single security holder, and went on to note that, once the

securities are redeemed, this protection in no longer necessary. Id. In the words of the Court:

---

[5]     The Indenture governing the Notes does contain a typical "no action" clause limiting the
circumstances in which a Noteholder may institute a judicial proceeding but only in the event of
a default. Fisch Aff. Ex. C at Section 5.5. Should defendants argue that this no action
provision, or any other provision of the Indenture, limits the ability of the Noteholders to bring
this action, the Court should be cognizant that the only two Noteholders are two Scudder Funds
that are owned by and controlled by the alleged wrongdoers. Defendants' related argument that
the Portfolio Management Agreement provides protection to the Portfolio Manager (Def. Mem.
at 6-7) also ignores that the two Noteholders are Deutsche Bank funds.

> Once the CVRs were redeemed, there were no CVR holders, and hence no holders in need of protection against unworthy lawsuits that no-action clauses are designed to provide. We note, moreover, that by its terms Section 806 [the no-action clause] limits the right of a "Holder" to bring suit. On its face, Section 806 does not apply to one who is no longer a "Holder." This is a common sense result.

Id. at 22. The Court in Rossdeutscher therefore allowed the individual investor to assert a claim based on the implied covenant of good faith and fair dealing on behalf of all former holders of the derivative securities. Id. Here, as in Rossdeutscher, the securities have been redeemed and there is nothing to preclude plaintiff from pursuing the claims asserted on a class basis. The Trust no longer exists, the securities have been redeemed and the Trust cannot assert the claims raised by plaintiff.

So as not to leave defendants' exposition of Delaware law unaddressed, plaintiffs will respond briefly. Defendants cite to the right law regarding the distinction between a class claim and a derivative claim but unfortunately reach the wrong conclusion. The Supreme Court of Delaware recently articulated the law to be applied going forward in determining whether a stockholder's claim is derivative or direct. As stated by the Court:

> That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original). Here, where the alleged wrongdoing occurred in the context of, and indeed caused, a liquidation of Trust where the Trust ceased to remain a legal entity,[6] the harm obviously is to the individual investors whose distributions were negatively affected by the wrongdoing alleged and

---

[6]     Section 11.1 of the Trust Agreement stated that the Trust shall terminate upon redemption of all of the outstanding Notes and Certificates. Fisch Aff. Ex. B at Section 11.1.

the benefit of any recovery would obviously flow to the individual investors in the form of an increased distribution.

**B.      Plaintiff Has Stated A Claim For Breach Of Fiduciary Duty**

Defendants do not deny that a fiduciary relationship existed between plaintiff and the Trust. Thus, to the extent that the Court determines that plaintiff may pursue claims on behalf of the Trust, defendants' argument with respect to fiduciary duty falls in turn. Plaintiff believes further, however, that it has the right to pursue a breach of fiduciary duty claim in its own right. Defendants argue that plaintiff has not alleged the existence of a fiduciary relationship between plaintiff and defendants. However, in so arguing, defendants ignore plaintiff's express allegations that, as Portfolio Manager of the Trust, Deutsche Asset Management assumed the role of a fiduciary with respect to the holders of Securities issued by the Trust. By entering into the Portfolio Management Agreement, Deutsche Asset Management assumed complete responsibility for the management of the Reference Loan Portfolio upon which all of the returns of the Trust depended. The power of the Portfolio Manager to direct the management of the Trust is evidenced by the express terms of the Trust Agreement which provides that "the Trustee shall exercise its trusts, powers and duties with regard to the management of the portfolio of Reference Loans **solely at the express direction of the Portfolio Manager** . . . ."  ¶ 32 (emphasis added). A fiduciary duty may be found to arise under such circumstances.

Under New York law, a fiduciary relationship exists from the assumption of control and responsibility. Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc., 45 N.Y.2d 692, 698 (1978). In determining whether a fiduciary relationship exists, "a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise and knowledge." Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 122 (N.Y. App. Div. 1st Dep't 1998). Where a

plaintiff alleges that an entity holds itself as experienced and that plaintiff relies on its expertise, whether or not a fiduciary relationship exists is a factual issue that cannot be resolved at the pleading stage. See Bestolife Corp. v. Am. Amicable Life, 5 A.D.3d 211, 216 (N.Y. App. Div. 1st Dep't 2004). Here, plaintiff reposed its trust in the Trustee who in turn delegated to the Portfolio Manager the duty to manage the Reference Loan Portfolio in a reasonably prudent manner. Plaintiff alleged that it specifically relied on the Portfolio Manager's willingness to act in that capacity and on its expertise in agreeing to enter into the Trust Agreement. ¶18. While defendants describe plaintiff as a "sophisticated investor," defendants do not claim that plaintiff had superior expertise in the arena of managing the Reference Loans. As a result, plaintiff agreed to grant significant power to the Portfolio Manager and agreed "to accept the express direction of the Portfolio Manager in accordance with the terms and conditions of the Portfolio Management Agreement." Fisch Aff. Ex. B at Section 8.6. Defendants ignore that in its dealings with Deutsche Asset Management, the Trust was at all times acting for its beneficiaries. Indeed, the fourth "Whereas" clause in the Portfolio Management Agreement states that the Trust was "directed" to enter into the agreement by the Noteholders and the Cetificateholders. Stern Ex. F at 1.

Defendants' argument with respect to the fiduciary duty claim also ignores, as do its other arguments, that the Trust no longer exists. As discussed in Point One, upon the liquidation of the Reference Loan Portfolio, any harm resulting from defendants' malfeasance ran directly to investors, not to the Trust. Whether characterized as a direct claim for breach of fiduciary duty brought by plaintiff against defendants or a derivative claims brought by plaintiff derivatively in the right of the Trust, the end result is the same -- the harm is to plaintiff and any recovery will flow directly to plaintiff.

Finally, defendants assert that plaintiffs are barred from bringing a breach of fiduciary duty action because, by acquiring certificates, plaintiff acknowledged a potential conflict within the business of the Portfolio Manager. However, acknowledgement of a conflict does not amount to a waiver of the right to pursue a breach of fiduciary duty claim. Plaintiff does not deny that there could be a situation where the Portfolio Manager acted prudently to sell its interest in a particular loan in the ordinary course to a source that could include itself. However, this is not what plaintiffs have alleged. Plaintiff has alleged that Deutsche Bank directed the redemption of the Notes and the liquidation of the entire Reference Loan Portfolio in order to further the corporate objectives of Deutsche Bank to the detriment of plaintiff. Deutsche Bank induced plaintiff to agree to its substitution as Portfolio Manager and then immediately altered the investment objective of the Trust, abandoning the Trust in favor of other investment opportunities. If Deutsche Bank then went and purchased those same loans in the distressed market, a fact that plaintiff will test in discovery, then that will be further evidence of Deutsche Bank's bad faith in causing the Trust to be liquidated. Further, as specifically alleged in the Complaint, while plaintiff acknowledged a "potential" conflict, at the time Debussy agreed to the substitution of Deutsche Asset Management as Portfolio Manager, Deutsche Bank did not indicate that it no longer wished to pursue the investment strategy, that it was considering redeeming the Notes or that its intention was to collapse the Trust as soon as it took over as Portfolio Manager. ¶22. Plaintiff agreed to the substitution of Deutsche Bank as Portfolio Manager without crucial information that could have affected its decision to consent.

### C.   <u>Plaintiff Has Stated A Claim for Breach of Contract</u>

A cause of action for breach of contract must plead the terms of the contract, the consideration, performance by the plaintiff and breach by the defendant causing plaintiff to

sustain damages. <u>Furia v. Furia</u>, 116 A.D.2d 694 (N.Y. App. Div. 2d Dep't 1986). Under the terms of its contract with the Trust, Deutsche Asset Management was obligated to "use such care and skill as a prudent man would exercise or use under the circumstances" in connection with the discharge of its duties under the Portfolio Management Agreement. ¶42. Plaintiff has set forth specific facts to support its allegation that Deutsche Asset Management breached its obligation to act prudently by firing experienced managers, by abandoning the Trust to serve its own interests despite the impact on investors and by liquidating the Reference Loan Portfolio in a manner that failed to maximize value for the Trust. The allegations contained in Count II are supported by the detailed allegations of the complaint. Plaintiff has properly pled a claim for breach of contract.

Defendants' response to plaintiff's allegations is two-fold. First, defendants assert (again) that plaintiff cannot pursue a contract claim on behalf of the Trust. As established above, plaintiff was the sole investor in the Certificates issued by the Trust, was entitled to dictate actions to be taken by the Trustee and is not precluded by any no action clause or any other provision of the Trust Agreement (which has no current legal effect in any event) from pursuing the breach of contract claim that resulted in millions of dollars directly to it. The Trustee, on the other hand, is precluded from taking action given the adverse effect of the Portfolio Manager who is the defendant here. Thus, under the very case relied upon by defendants, plaintiff must be permitted to assert the breach of contract claim because plaintiff is the only entity that can. <u>See Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.</u>, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *11 (S.D.N.Y. Dec. 22, 2003), <u>aff'd</u>, 110 Fed. Appx. 191 (2d Cir. 2004)(permitting third party recovery when no other person could recover). This conclusion is buttressed by the relationship between Debussy and the Trust. When Deutsche Asset

Management succeeded Scudder as Portfolio Manager, it was taking over a contract with the Trust, not with Chase Delaware as Trustee. Debussy is the only entity with a financial interest in Certificates issued by the Trust and was entitled to dictate the Trust's actions under the terms of the Trust Agreement. Acceptance of the notion that some other entity is better suited or more appropriate to pursue current claims that brought significant harm to Debussy is inequitable and illogical. Debussy is better suited to represent the Trust than any other entity and is entitled to do because the underlying securities have been redeemed.

Defendant's second argument with respect to the breach of contract claim is that plaintiff has failed to plead a "breach of any specific provision of the Portfolio Management Agreement." Def. Br. at 16. This argument is puzzling given plaintiff's word-for-word recitation of the provision of the Portfolio Management Agreement that plaintiff alleges was breached. Specifically, paragraph 42 of the Complaint states that "[a]t all relevant times, the Portfolio Manager was obligated under its contract with the Trust to 'use such care and skill as a prudent man would exercise or use under the circumstances' in connection with the discharge of its duties under the Portfolio Management Agreement." The language quoted in the Complaint is found at Heading 3(e) of the Portfolio Management Agreement where the Portfolio Manager expressly agreed to act prudently in performing its services. Fisch Aff. Ex. D. The Complaint goes on to allege, based on the factual recitation that precedes the counts, that "Defendants DeAM breached its obligation under the Portfolio Management Agreement to act prudently . . .." ¶45. Defendants are simply mistaken in arguing that the Complaint does not specify the provision of the contract that plaintiff believes was breached.

### D.     Plaintiff's Claims Are Not Duplicative

The fact that allegations underlying a breach of fiduciary duty claim may overlap with facts underlying a breach of contract claim does not require dismissal of the breach of fiduciary duty claim.  Plaintiffs are always permitted to plead alternative, and even contradictory, theories of liability.  Raglan Realty Corp. v. Tudor Hotel Corp., 149 A.D.2d 373 (N.Y. App. Div.1st Dep't. 1989).  See also CPLR § 3014.  The same conduct may constitute both a breach of contract and a breach of fiduciary duty.  See Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc., 283 A.D.2d 448 (N.Y. App. Div. 2d Dep't 2001).  Furthermore, pleading a breach of fiduciary duty is appropriate where a plaintiff, even if claiming a breach of contract, desires a remedy in tort for betrayal and breach of trust,  Zimmer-Masiello, Inc. v. Zimmer, Inc., 159 A.D.2d 363, 367 (N.Y. App. Div. 1st Dep't 1990).  Where a fiduciary duty may be found, this claim is generally not fatally duplicative of a breach of contract claim.  Davis v. Dime Sav. Bank, 158 A.D.2d 50 (3d Dept. 1990).

### E.     Deutsche Bank Is A Proper Party

Deutsche Bank is the parent company of Deutsche Asset Management and Deutsche Bank is the entity that plaintiff alleges is a competitor of the Trust in the market for the secured bank debt underlying the Trust.  Plaintiff alleges that the alleged wrongdoing was carried out at the behest of and for the benefit of Deutsche Bank and that it was the corporate objectives if Deutsche Bank that were served by liquidating the Trust, rather than the interests of the mutual funds that held the Notes (and of course plaintiff).  Plaintiff also alleges that it was Deutsche Bank or Deutsche Asset Management that was responsible for the firing of key Scudder employees, for prematurely abandoning the Trust and for causing the two Noteholders to execute notices of redemption that operated as a forced dissolution of the Trust.  ¶¶22-23.  Further, it is

Deutsche Bank that plaintiff alleges may have bought the underlying assets of the Trust at a bargain in the distressed market into which it chose to sell the Riverside II assets.  ¶38.  While, without discovery, plaintiff cannot plead with greater specificity the exact role of Deutsche Bank, the parent company, in the alleged wrongs or even the working relationship between Deutsche Bank, Deutsche Asset Management and DIMA, the Complaint puts Deutsche Bank on notice of the claims against it and should not be dismissed at the pleading stage before plaintiff has the opportunity to pursue discovery to understand and establish the working relationship between the various Deutsche Bank entities.[7]

## CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss the Complaint should be denied in its entirety.

Dated:  October 21, 2005

ABBEY GARDY, LLP

By:    /s/ Karin E. Fisch
        Arthur N. Abbey (AA-8079)
        Karin E. Fisch (KF-1082)
        212 East 39th Street
        New York, New York 10016
        Telephone:  212-889-3700
        Facsimile:  212-684-5191

        Attorneys for Plaintiff

---

[7]    If the Court is inclined to grant defendants' motions to dismiss, plaintiff should be given leave to re-plead. Fed. R. Civ. P. 15(a) expressly provides that a party may amend by leave of court and that "leave shall be freely given when justice so requires."  Moreover, leave to amend "should be granted absent 'some justification for refusal.'"  Ferber v. Travelers Corp., 785 F. Supp. 1101, 1112 (D. Conn. 1992) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  When complaints are dismissed for pleading deficiencies they are "almost always" dismissed with leave to amend.  Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).